EQUITABLE LIFE INSURANCE COMPANY OF IOWA, Appellant, v. C. C. TAFT COMPANY et al., Appellees.

**LANDLORD AND TENANT:** Substitution of Tenant. A stranger to a lease who contracts with the landlord to pay all rent accruing *in the future* under the lease, and who acquires not only the landlord's cause of action for *accrued* rent, but also the landlord's contract remedies for the enforcement of the payment of all said rentals, including the right to dispossess the tenant and to take possession, thereby constitutes himself a *guarantor* of the tenant's obligation to pay such rentals; but as soon as such guarantor avails himself of such remedies and dispossesses the tenant and assumes possession himself, he becomes a *tenant* of the landlord, under the former tenant's lease. In other words, the one-time guarantor, by dispossessing the tenant and taking possession himself, thereby steps into the shoes of the dispossessed tenant.

**QUIETING TITLE:** Law(?) or Equity(?) One who claims to be the landlord of one in possession of realty, and finds that his claim is repudiated, need not wait until, on his theory, the tenancy has ceased, and then proceed by forcible entry and detainer, or ejectment, but may immediately avail himself of an equitable action to quiet title. (Sec. 4223, Code, 1897.)

*Appeal from Polk District Court.*—LESTER E. THOMPSON, Judge.

NOVEMBER 26, 1920.

REHEARING DENIED DECEMBER 15, 1921.

SUIT in equity, to quiet title. There was a demurrer to the petition, and the plaintiff appeals.—*Reversed and remanded.*

*Parrish, Cohen & Guthrie,* for appellant.

*W. C. Strock* and *Miller, Parker, Riley & Stewart,* for appellees.

EVANS, J.—I. The plaintiff is the grantee of the Capital City Investment Company. Prior to April 22, 1919, the said investment company was a long-term leaseholder of certain city property in Des Moines. For the purpose of this case, it may be deemed and will be referred to herein as the "owner" thereof. This prop-

1. LANDLORD AND TENANT: substitution of tenant.

erty is described as Lots 7 and 8 in Block 12, and is known also as 608 and 610 West Locust Street, in the city of Des Moines. On March 4, 1912, the investment company executed a written lease of such property to O'Callaghan, for a term to expire on September 30, 1927. The agreed rental was to be $608.33 per month until September 30, 1922, and $775 per month after such date. Such lease contained the following reservation:

"Should the said building be totally or substantially detroyed by fire or other casualty during the period beginning October 1, 1922, and ending September 30, 1927, or should the lessor dispose of its interest in the said premises prior to or during said period, then the lessor, upon the happening of any of said events, shall have and hereby reserves the right, upon sixty (60) days' notice in writing, to cancel this lease for the remainder of said period."

The investment company having sold the property to the plaintiff, the Equitable Life Insurance Company, it served notice of its election to terminate the lease on September 30, 1922. The plaintiff, as purchaser from the investment company, served a like notice. This notice was given to the present tenant in possession, the defendant Taft Company. The process by which Taft became successor to O'Callaghan is the result of a contract entered into between the investment company and Taft. The situation confronting the parties now differs from that existing when their contract was made, and their mutual rights and relations have thereby become very complicated and difficult of ascertainment. This contract was entered into December 31, 1914. At that time, O'Callaghan was in arrears in the payment of rent to the amount of over $13,000. For reasons not appearing in the record, Taft desired to acquire the claim of the investment company against O'Callaghan, and a contract to that end was entered into between him and the investment company, of which the following was a part:

"Whereas, on the 4th day of March, 1912, the party of the first part entered into a written contract with the said Robert E. O'Callaghan, whereby the said leases were extended to the 30th day of September, 1927, at a rental of six hundred eight and 33/100 ($608.33) dollars for each and every month from

and after March 1, 1912, up to the 30th day of September, 1922, and at a rental of seven hundred and seventy-five ($775.00) dollars for each and every month from and after the 30th day of September, 1922, up to the 30th day of September, 1927, a copy of said contract is hereto attached and made a part hereof, and * * *

"Whereas, there has, in the carrying out of the said contracts with the said Robert E. O'Callaghan, accrued and is now due from the said Robert E. O'Callaghan to the party of the first part, the sum of thirteen thousand, three hundred twenty-eight and 33/100 ($13,328.33) dollars, and

"Whereas, the party of the second part desires to obtain an assignment of the said lease and claim of the party of the first part, against the said O'Callaghan, lessee,

"Now Therefore, it is agreed between the parties hereto, that the party of the first part shall and does hereby sell, assign and transfer unto the party of the second part, its claim for thirteen thousand, three hundred twenty-eight and 33/100 ($13,328.33) dollars against the said Robert E. O'Callaghan, to the party of the second part, and the party of the second part agrees to pay to the party of the first part therefor, the full amount thereof, with interest at six (6) per cent per annum, payable annually, from this date, in installments as follows: * * *

"The party of the first part does also hereby sell, assign and transfer to the party of the second part, the lease hereto attached, between the party of the first part and the said Robert E. O'Callaghan, dated the 4th day of March, 1912, and the other leases referred to therein and above referred to, together with all rights of the party of the first part as lessor, to collect rentals now due or hereafter to become due thereunder, including all of the rentals comprehended within the said sum of thirteen thousand, three hundred twenty-eight and 33/100 ($13,328.33) dollars, with the right, if the party of the second part desires, to enforce the said contracts and the said claim, in the name of the party of the first part, but at the expense of the party of the second part.

"The party of the second part hereby agrees to pay to the party of the first part, in addition to the sums above referred to, the monthly rental of six hundred eight and 33/100

($608.33) dollars from the 1st day of January, 1915, up to and including the 30th day of September, 1922, and the monthly rental of seven hundred and seventy-five ($775.00) dollars, from the 30th day of September, 1922, up to and including the 30th day of September, 1927, with interest on deferred payments at the rate of six (6) per cent per annum, said rentals to be paid on the first day of each and every month, beginning with the first day of January, 1915, all as provided in said contract of March 4th, 1912, above referred to, a copy of which is hereto attached, and the party of the second part agrees to be subject to and perform all of the terms and conditions of the said contract of March 4th, 1912, whether to be performed by the lessor or lessee, save and except only that the party of the first part shall heat the said building and shall keep the roof and exterior walls thereof in repair in the manner and upon the conditions provided for in such contract of March 4th, 1912.''

The foregoing comprises all the granting clauses of such contract. It will be seen that it purports only to be the assignment of a cause or causes of action accrued and to accrue, together with the right of enforcing the security held by the assignor. Though this contract did not in terms confer upon Taft a right of possession of the real estate, it nevertheless stipulated for a lien in favor of the assignor upon all property kept or used upon the premises, and a lien upon the lease itself, and further provided for a forfeiture and a surrender of the premises by Taft, in the event of failure to perform his undertakings. Whether Taft Company is to be regarded as a lessee of the investment company or as a lessor of O'Callaghan, and whether, for the purpose of this case, it stands in the original shoes of the investment company or whether in the shoes of O'Callaghan, are the troublesome questions presented. The petition avers that Taft Company did enter into possession. The enforcement of O'Callaghan's lease against him enabled Taft Company to declare a forfeiture against O'Callaghan for a failure to pay rent. We may assume, therefore, that Taft's possession resulted from the enforcement by him of the lease against O'Callaghan. There is a sense in which it might be said:

(1)    That Taft Company became lessee of the property, subject to the rights of O'Callaghan; or

(2)   As assignee of the O'Callaghan lease, it became lessor to O'Callaghan; or

(3)   By the undertaking of its contract, it became guarantor of the performance of it by O'Callaghan; or

(4)   In consideration of the acquisition of the claim of the investment company against O'Callaghan, it bound itself to pay all the sums specified in the contract.

Manifestly, if O'Callaghan had met the obligations of his lease, Taft Company never could have become a tenant of the property, under its contract with the investment company.   The obligations of the investment company to O'Callaghan would have remained the same, and the relation of landlord and tenant between the investment company and O'Callaghan would have continued unabated, subject only to the right of Taft Company to enforce the collection of the rent from O'Callaghan. But the *status quo* existing at the time of the Taft contract did not continue.   O'Callaghan did lose possession and did cease to be a tenant.   Taft Company enforced the O'Callaghan lease and dispossessed O'Callaghan, and itself entered into possession. In whose shoes did it then stand?   If O'Callaghan had voluntarily assigned his lease to Taft Company, and pursuant to such assignment, had surrendered possession, it would seem clear that Taft Company would thereby stand in the shoes of O'Callaghan. Would the fact that no voluntary assignment was made, and that the rights of Taft Company were acquired by enforcement of the terms of the O'Callaghan lease, make Taft Company other than a successor to O'Callaghan?   It is rather important to bear in mind at this point that Taft Company held the lease against O'Callaghan, not as *owner* of the property, but as the holder of a cause of action, the security of which consisted of certain provisions in the lease.   The assignment of the lease by the landowner to this purchaser of the cause of action for rent carried such security and the right to enforce the same.   In the very nature of the case, it could carry nothing more.   The situation at this point is analogous to the case of a purchaser of a note and mortgage.   Though the purchaser, as owner, holds the legal title of the mortgaged chattel property, he holds it only as security for the note.   The real subject-matter of his purchase is the note.   If the note be paid, the purchaser's title and

right to the mortgaged property cease.   If enforcement of the mortgage be resorted to, it can only be done for the purpose of and to the extent necessary to collect the note.   When that point is reached, the mortgage dies, whatever its terms may be. The case presented before us is vitally different from a case of assignment of a lease by a vendor of real estate to his vendee, in fulfillment of the covenants of his deed or contract.   In such a case, the vendee, as assignee of the lease, steps permanently into the shoes of his vendor and assignor.   The fallacy, we think, in the argument of the appellee here is that it assumes the position of Taft Company to be equivalent to that of a vendee of land, as assignee of his vendor.   To so construe the contract is to involve it in much complication and inconsistency.   Treating Taft Company, therefore, as the assignee of a cause of action accrued and to accrue, with a right to enforce collection of the same by resort to the remedies provided in the assigned lease, we must follow the changing status of the parties as the enforcement proceeds.   The remedy provided gave Taft Company a lien upon all the personal property of O'Callaghan upon the premises, and gave it a right also to declare a forfeiture and to take from him the possession of the premises.   Assume, for the sake of the argument, that it fully enforced its lien against the personal property, and thereby appropriated all of it to the payment of his debt, that remedy would then be exhausted.   Assume further that it declared a forfeiture and took possession of the realty, this would exhaust that remedy.   By this latter remedy, it would be protected against the loss of the installments of rent to accrue in the future.   In appropriating the personal property for the payment of its debt, did it not acquire its title thereto through and under O'Callaghan?   In taking possession of the real estate, did it take any more than O'Callaghan had?   Its right of enforcement was commensurate with the title and right of O'Callaghan, neither more nor less.   This is, perhaps, a sufficient indication of the line of reasoning which is controlling of the rights of the parties.   We think the case is one where the contract between the parties, indefinite as it is, must be construed in the light of their subsequent conduct under it, and account must be taken of the changing status of Taft Company, resulting from its enforcement of its remedies.   This leads us

to the conclusion that, whatever the relation which Taft Company sustained to the property while O'Callaghan continued as the tenant in possession, when O'Callaghan surrendered, and Taft Company entered into possession as his successor, it became a lessee of the property. If a lessee, was it the lessee of the investment company? It created its own status as lessee by enforcement of the O'Callaghan lease. It was permitted to do so under its contract with the investment company. To become a lessee was a mere incident of its enforcement of the lease. If such a status were to be deemed an additional burden upon it, it was a burden incident to the benefit which it enforced. The O'Callaghan lease was the only one in existence under which it could become a lessee. That lease was made a part, by reference, of its contract with the investment company. A copy of that lease was attached to such contract. It follows, we think, that Taft Company not only became successors to O'Callaghan in possession of the property, but it became such successor under the O'Callaghan lease. Its contract with the investment company expressly stipulated that it was subject to all the terms and conditions of that lease. That the investment company reserved to itself all its rights under the O'Callaghan lease except the right of enforcing the collection of rent is indicated in its contract with Taft Company by the portion thereof above quoted. The very undertaking of Taft Company to pay the installments of rent was to be "all as provided in said contract of March 4, 1912, a copy of which is hereto attached and the party of the second part agrees to be subject to and perform all of the terms and conditions of the said contract of March 4, 1912." Manifestly, therefore, the investment company did not part with all its right and interest in said lease. Inasmuch as Taft Company came into possession of the real estate pursuant to the enforcement of its remedy, it was necessarily the tenant of someone. As already pointed out, the contract of December 31, 1914, with Taft Company did not purport to be a lease, except so far as it incorporated by reference the O'Callaghan lease. In enforcing its remedy of forfeiture against O'Callaghan, Taft Company succeeded to all the rights and privileges of O'Callaghan under his lease. This was a status which did not exist at the time Taft Company's contract was entered into,

but it was one which, under such contract, Taft Company could create, or could refrain from, as it should choose.

At this point, we take consideration of one provision of the contract of December 31, 1914, upon which the appellee lays particular stress, and legitimately so.  This is found in the latter part of the quotation from the Taft contract above made, as follows:

''The party of the second part agrees to be subject to and perform all of the terms and conditions of the said contract of March 4, 1912, *whether to be performed by the lessor or lessee* save and except,'' etc.

The significance of this provision arises out of certain specific terms and conditions in the O'Callaghan lease, as follows:

''Should the said building be injured by fire during the term of this lease to such an extent only as to render the same untenable an abatement shall be made of the rent, for the period said premises are rendered untenable; such abatement of rent to be in that just proportion that the part or parts of the building rendered untenable bears to the whole building and its rental value as hereinbefore fixed.

''Should the said building be totally or substantially destroyed by fire, during the period of this lease ending on the 30th day of September, 1922, the lessor agrees to rebuild the same within a reasonable time, to the height of at least two (2) stories and this lease shall continue as to the building so rebuilt, provided however, that if the lessor rebuild only to the height of two (2) stories, then in that event there shall be deducted from the rental during the remainder of the period up to September 30th, 1922, five hundred ($500.00) dollars per year, but should the lessor rebuild the said building to the height of three (3) stories, the rental shall continue during the remainder of said period as herein first above provided.

''Should the said building be totally or substantially destroyed by fire or other casualty during the period beginning October 1st, 1922, and ending September 30th, 1927, or should the lessor dispose of its interest in the said premises prior to or during said period, then the lessor, upon the happening of any of said events, shall have and hereby reserves the right, upon

sixty (60) days' notice in writing, to cancel this lease for the remainder of said period."

Putting the proviso thus quoted from the contract of December 31, 1914, against the terms and conditions here quoted from the O'Callaghan lease, what does it mean? Appellee contends that, by this quoted proviso, Taft Company bound itself to perform all its burdensome conditions, imposed upon either lessor or lessee. Suppose, for instance, that, before September 30, 1922, the leased building should be consumed by fire, and suppose that O'Callaghan had performed all his obligations and had continued in possession up to that time, under the lease the investment company, as between it and O'Callaghan, would be bound to reconstruct to the extent of two stories. Was such obligation of the investment company imposed upon Taft Company by the contract of December 31, 1914? Suppose that, on and after October 1, 1922, the investment company had continued as owner, and that O'Callaghan had performed and continued in possession as tenant, could Taft Company elect to terminate the lease upon 60 days' notice? Or suppose a fire were to occur during such period, could Taft Company elect to terminate the lease on that ground? The argument for appellee rests upon an affirmative answer to these queries. The contention is that Taft Company did undertake this very obligation to rebuild, and that it took this right of election as an appropriate consideration for assuming such burden. The situation which we have assumed in the foregoing hypothesis was a possible one, and must be deemed to have been within the contemplation of the parties when the Taft contract was entered into. If the original status of the parties had continued, and the situation assumed in our hypothesis were to arise, what should be the proper construction of the contract as to the obligation of Taft Company to rebuild, in the event of loss by fire before September 30, 1922? It should be noted first that the obligation to rebuild, if enforced upon Taft Company, would be a very onerous one. It would be vastly more onerous and in its nature more inequitable as an obligation of Taft Company than it would be as an obligation of the investment company, as owner. The obligation of the owner of the property to rebuild is not necessarily an onerous one. While it calls for the

same outlay of capital, nevertheless the cost of the rebuilding enhances to that extent the value of his property. To Taft Company the cost of rebuilding would be a total loss, because it would have no such interest in the property as could take enhancement of value. Its alleged leasehold interest would expire while the reconstruction was in progress. It might well happen that the investment company, as owner, would have insurance which would fully indemnify it for the loss by fire, and which would furnish the capital for the rebuilding. Taft Company could have no claim upon the insurance, under the terms of the contract. Manifestly, if the contract were before the court for construction upon an issue wherein Taft Company were denying liability for rebuilding, the court would be slow to construe the contract to such an unconscionable result. It is to be conceded that the proviso before us is very sweeping, but it is not specific or definite. To say that Taft Company should "perform" all the terms and conditions of the contract, whether to be performed by lessor or lessee, involves some apparent inconsistency and contradiction of terms. The obligations of a contract are necessarily mutual, and involve mutual promises by two or more persons. To say that a third party may step into the shoes of *one* party to a contract and agree to perform the obligations of *both* parties is to put such party in the attitude of making a contract with himself. This part of the contract could be rendered consistent by construing the word "perform" as synonymous with the phrase preceding it, "to be subject to."

"And the party of the second part agrees to be subject to (and perform) all of the terms and conditions of the said contract of March 4, 1912, whether to be performed by the lessor or lessee."

There is something to be said against this construction, especially in view of the exception which follows said proviso, and we are not disposed to commit ourselves to it.

Reverting to what we have already said, that the only interest acquired by Taft Company in the O'Callaghan lease was a right of security and remedy, the obligations undertaken by it must be construed with reference to the nature of its right and title. This means that, so far as Taft Company should

desire and undertake to enforce its remedies under the lease for a collection of its cause of action against O'Callaghan, it must itself protect the enforcibility of its lease. As to it, the investment company did not undertake to protect the same, save as to the exception noted in the above quotation. If the building should be destroyed by fire, and the premises thereby became untenantable, he would, to that extent, lose his right to collect accruing rents during the period when the building should be untenantable. Though the investment company had bound itself to O'Callaghan to rebuild up to two stories, it was not so binding itself to Taft Company, as a holder of the cause of action for the rents. Perhaps Taft Company could render the premises tenantable by rebuilding, and thereby claim accruing rents; but the real measure of its damage and loss would be the loss of accruing rents. It could not, under its contract of December 31, 1914, have recourse against the investment company for failure, if any, to rebuild. Whether a failure to rebuild would release Taft Company from further payment of rent, we do not decide. Difficult and indefinite as it is, this, we think, is the natural, reasonable, and equitable construction of this part of the contract.

When we consider further that, by subsequent events, Taft Company exhausted its full right of remedy and enforcement for the collection of its debt, no further function was left for the contract of December 31st. All its executory provisions ceased to speak, as the executory provisions of a mortgage cease to speak after the remedy of its enforcement has been exhausted. As a result of enforcing its remedy, Taft Company put itself voluntarily into the tenancy of O'Callaghan. It is immaterial whether it be deemed to be paying the rent pursuant to the O'Callaghan lease, or as pursuant to the contract of December 31, 1914. The contract and the lease are concurrent in that respect, providing for payment of the same rental, upon the same installments, and upon the same dates. In that respect, the two contracts merge, as they were intended to do.

If we have correctly analyzed the relation of the parties up to this point, it follows also that Taft Company acquired no right of election to terminate the lease on and after October 1, 1922. The condition precedent to the right of termination

was either one of two:   (1)   That the building should be destroyed by fire; or (2) that the investment company should sell its property.

The investment company could elect for itself, either to sell its property and cancel the lease, or it could continue to hold its property and submit to a continuance of the lease. Surely, Taft Company could not elect for it whether it should sell its property or not. Furthermore, in the event of destruction by fire after October 1, 1922, the investment company, as owner, could elect to rebuild or to terminate the lease. If it should elect to rebuild, O'Callaghan could not elect to terminate the lease. If O'Callaghan could not, Taft Company cannot. Otherwise, the right of election to the investment company to rebuild would be nullified.

The case presented is without a precedent, so far as search has disclosed. The contract of December, 1914, was unique in its conception, in its performance between the parties, and in its enforcement against the third party. The problem presented by it must be solved, nevertheless, by the application of well recognized legal principles. We have aimed to reduce its component fractions to a common denominator, and to adopt the equation resulting therefrom.

To sum up our conclusion in a word, the December contract created for Taft Company a *dual* capacity. As between it and the investment company, it stood for O'Callaghan, and guaranteed his contract. On the other hand, as between it and O'Callaghan, it stood for the investment company, and held all the weapons of enforcement. Because of the arrearage of O'Callaghan, it had the power to eliminate him. It could also elect to tolerate his arrears and to protect him in his tenancy. Having eliminated O'Callaghan, only two parties remained. The *dual* capacity of Taft Company thereby ceased. As between it and the investment company, it was O'Callaghan. It not only stood for him as a guarantor, but it stood in his shoes as a successor in tenancy. This advance step was of its own volition, pursuant to the power conferred on it by the December contract. It stood thenceforth as the tenant of the investment company, subject to all the terms and conditions of the O'Callaghan lease, and likewise entitled, as tenant, to the beneficial conditions thereof.

This conclusion requires that the demurrer to the petition should have been overruled as to this ground.

II.   One ground of the demurrer was that the action was prematurely brought, and that it was improperly brought in equity, in that the plaintiff had a plain, speedy, and adequate remedy at law.   The argument in support of this ground is that the plaintiff had abundant remedy to bring an action for forcible entry and detainer, or an action of ejectment at the termination of the lease.   The point cannot be sustained.   The case comes fairly within the scope of our quieting-title statute (Code Sections 4223 *et seq.*), as it has been heretofore construed.   The very purpose of this statute is to permit prompt litigation over all controversies between adverse claimants of title.   The merchantability of the title to real estate is sensitive, and easily impaired by adverse claims, however unfounded.   To compel the plaintiff herein to await the termination of the lease before litigating the disputed rights asserted, would be to impair the present merchantability of its title, and to deprive it of its right of possession while the future litigation should be pending.   It is certain *now* that it would encounter a dispute *then* as to the date of the termination of the lease.   In the interest of efficient and timely remedy, there can be no equitable reason why such dispute should not be determined now.   We have heretofore construed our statute broadly, and as applying to every form of hostility to the full right and unclouded title of the petitioner.   The plaintiff in such case is entitled to precipitate the litigation, and to bring in his adversary at once, to try the question of right.   The statutory action is in the nature of an action of right and *quia timet*.   The action may be brought against one who asserts a mere lien, or who permits an apparent lien to becloud the title of the plaintiff.   *Blair v. Hemphill,* 111 Iowa 226, and the cases therein cited.   This ground of demurrer should also have been overruled.   It was erroneous, therefore, to sustain the demurrer upon either ground thereof.   The judgment below must, therefore, be—*Reversed and remanded.*

WEAVER, C. J., PRESTON and SALINGER, JJ., concur.

2. QUIETING TITLE: law (?) or equity (?)